STATE OF NEBRASKA, APPELLEE, V.
MICHAEL J. GUNTHER, APPELLANT.
716 N.W.2d 691

Filed June 30, 2006.    No. S-05-586.

Gregory A. Pivovar for appellant.

Jon Bruning, Attorney General, and George R. Love for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

Michael J. Gunther was charged with first degree murder and use of a firearm to commit a felony in the shooting death of Michael R. Zawodny. At trial, Gunther waived his constitutional right to counsel and represented himself. He was convicted by a jury on both counts. He was sentenced to life imprisonment without the possibility of parole on the murder conviction and to a period of 10 to 20 years' imprisonment on the firearm conviction, to be served consecutively. He now appeals his convictions and his sentence of life imprisonment without the possibility of parole.

## SCOPE OF REVIEW

■ In determining whether a defendant's waiver of counsel was voluntary, knowing, and intelligent, an appellate court applies a "clearly erroneous" standard of review. *State v. Delgado*, 269 Neb. 141, 690 N.W.2d 787 (2005).

■ In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Aldaco, ante* p. 160, 710 N.W.2d 101 (2006).

## FACTS

During May 2004, Gunther learned that Sally Kennedy, with whom he had been involved in a romantic relationship, was "sleeping with" other men, one of whom was Zawodny. On May 23, Gunther confronted Zawodny and shot him 11 times.

The State charged by information that on or about May 23, 2004, in Sarpy County, Nebraska, Gunther did purposely and with deliberate and premeditated malice kill Zawodny. Gunther was also charged with use of a firearm to commit a felony. The State did not indicate an intent to seek the death penalty by filing

a notice alleging aggravating circumstances, as required by Neb. Rev. Stat. § 29-1603(2)(a) (Cum. Supp. 2004).

During the pretrial motions, one of Gunther's three attorneys informed the court of Gunther's request that the death penalty be imposed against him. The following colloquy took place between the court and Gunther:

[The court:] Sir, you are charged in this Information with two counts: One is murder in the first-degree; the other is the use of a firearm to commit a felony. Do you understand what you're charged with, sir?

MR. GUNTHER: Yes.

THE COURT: Now, sir, the possible penalty on Count I — the [S]tate, under our death penalty statute, has not filed an aggravator, so the only — and at this juncture they cannot file an aggravator. Therefore, the only penalty that I can impose, regardless of what your request may be, is life without parole. Now, do you understand that?

MR. GUNTHER: No.

THE COURT: Why do you not understand that, sir?

MR. GUNTHER: Because I want the death penalty.

THE COURT: Well, sir, that is not an option; do you understand that?

MR. GUNTHER: I don't care.

THE COURT: What do you mean, sir?

MR. GUNTHER: Just what I said, I want the death penalty. I'll ask the jury for it.

. . . .

THE COURT: The jury cannot impose it; do you understand that?

MR. GUNTHER: No.

THE COURT: What makes you think the jury can impose it if I'm telling you what the law is, sir?

MR. GUNTHER: I think they can.

THE COURT: They cannot. Only the Court can impose the death penalty, and that's if the — if the jury finds the aggravator.

Under our death penalty statute, the jury does not set the penalty; do you understand that?

MR. GUNTHER: No.

[Counsel for Gunther]: Do you understand the words the Judge is telling you?

THE COURT: Do you understand that I'm telling you what the law is, sir?

MR. GUNTHER: I understand what you're saying, but I understand what I want, too.

THE COURT: Well, but do you understand that that will not happen?

MR. GUNTHER: No.

THE COURT: Why do you not understand that, sir? What makes you think that you can receive the death penalty?

MR. GUNTHER: Because I'm going to give the jury enough evidence.

THE COURT: You understand that the jury will not set the penalty?

MR. GUNTHER: No.

THE COURT: This is a rhetorical go-around at this point.

I'm just telling you, sir, the law is clear, the death penalty is not an option.

Now, on Count II of the Information, the possible penalty is not less than one year nor more than 50 years to be added onto your life sentence without parole, if you're convicted.

Now, do you understand the penalty there, sir?

MR. GUNTHER: Yes.

THE COURT: Okay. Now, let's go into this again. Why do you think that the jury can sentence you to death when I'm telling you the law is clear that they cannot?

MR. GUNTHER: Because I'm going to give them evidence to do it.

THE COURT: Even if I tell you regardless of what evidence you give?

MR. GUNTHER: Even regardless of what you say.

After further discussion regarding pretrial motions, Gunther informed the court, "I want to fire my attorneys." The court questioned Gunther as to why he wanted to fire his attorneys, and Gunther replied, "Because they don't want to get me what I want." Gunther told the court he wanted the death penalty. The court informed Gunther that the death penalty could not be imposed for the reasons previously given, but Gunther continued to

argue the point. The court then read applicable homicide and sentencing statutes to Gunther and explained that because the State had not filed a notice of aggravating circumstances, the death penalty was not available as a sentence in this case. Gunther stated he did not understand and claimed collusion among the court, the prosecutor, and his attorneys. The court reiterated that it could not impose the death penalty in this case.

One of Gunther's attorneys addressed the court, stating:

> I want to make sure the record is clear on the motion to discharge counsel. He does not want our assistance — he believes that there is collusion between us, the prosecution and the Court to deny him the death penalty. He wants to select the jury himself, he wants to address the jury, he wants to make an opening statement himself, he wants to make a closing argument himself, he wants to examine and cross-examine witnesses himself, so — he has expressed this to me and the other defense attorneys over and over again, so I want to make sure that the record is complete about the reasons for the — the motion to discharge the attorneys.

The court then inquired of Gunther whether what his attorney had said was correct, and Gunther responded: "That's correct." Gunther stated he was asking the court to allow him to represent himself.

The court proceeded to ask Gunther whether he knew the date, where he was, how old he was, his birth date, where he was born, his mother's name, whether he had served in the military, other personal facts concerning his family, the names of his siblings, where he had lived the previous 10 years, whether he had been married, and whether he had any children. Gunther competently answered all these questions. The court asked Gunther whether he understood that if he was allowed to represent himself, he could not raise on appeal the fact that no counsel was provided to him. Gunther indicated he understood, and the court instructed him that he would be required to follow the procedures of the court. Gunther agreed to do so as long as he knew what the procedures were.

The court next discussed the peremptory challenges that would be exercised by the parties and the procedure for doing so. Gunther was informed that he would be in charge of his

defense, that he could make an opening statement and a closing argument, and that he would be the only person who presented evidence for the defense and the only person who would cross-examine the State's witnesses. Gunther indicated he understood. The court concluded that Gunther was competent to represent himself and granted his motion to discharge his attorneys; however, the court appointed Gunther's prior attorneys as standby counsel. Prior to the commencement of trial, procedural motions were addressed. The court sustained a reciprocal motion that no witnesses would be permitted in the courtroom while other witnesses were testifying and sustained the State's motion for endorsement of two additional witnesses. Standby counsel were given an opportunity to confer with Gunther about his opening statement, and the trial proceeded with Gunther representing himself.

The State offered the testimony of four witnesses to the shooting of Zawodny. John Hanna, a carnival worker, testified that he knew Gunther and Zawodny and that during the evening of May 23, 2004, he was working at a "Skeeball" game, located at a carnival near Offutt Air Force Base in Bellevue, Nebraska. Between 7:30 and 8 p.m., Hanna saw Gunther walk up the carnival midway, and 10 to 15 minutes later, he saw Gunther approach Zawodny. Hanna next saw Gunther pull a gun, point it at Zawodny, fire a shot at Zawodny's head, and then fire four or five more shots. After Zawodny fell, Gunther stood over Zawodny's feet and "unloaded the gun from head to chest . . . until it wouldn't shoot anymore."

Aaron Fleischmann testified that as he was walking near the carnival area, he saw a man on the ground and another man standing above him, shooting a gun into the first man's back or side. Fleischmann saw three or four flashes of light come out of the gun, and as he ran away, he heard another three or four shots coming from the same area.

Joshua Meinders was a military policeman stationed at Offutt Air Force Base and was off duty the evening of May 23, 2004. He was at the base carnival with his family, and when he heard gunshots, he immediately began running toward the sound. Meinders saw Gunther walk from Zawodny's legs to his head and "put a last round into him."

Christopher Davis, a carnival worker who knew both Gunther and Zawodny, testified that he had talked to Gunther at the carnival around 8:25 p.m. Shortly after the conversation, Gunther walked away and Davis heard gunfire. Davis "went running . . . as fast as [he] could" because his wife and child were in a trailer near the scene of the shooting. Davis heard about six gunshots. When Davis arrived and was about 20 feet from the scene, he observed Gunther standing over Zawodny with a gun. Davis testified that Gunther said to him: "This is the mother fucker been fucking Sally." Gunther then turned around and "pumped the last five rounds" into Zawodny's neck and face.

Dr. Jerry Jones, the forensic pathologist who performed Zawodny's autopsy, testified that there were 11 separate gunshot wounds to the body. There were six wounds to the head and neck, two to the back of the right side of the chest, two to the left side of the abdomen, and one to the left upper inner thigh. Four bullets were recovered from Zawodny's body, two of which were large caliber and two of which were small caliber and consistent with .22-caliber bullets. In Jones' opinion, Zawodny died of multiple gunshot wounds with penetration of the brain, both lungs, and other vital areas of the body. A .38-caliber revolver and a .22-caliber pistol were recovered from the scene of the crime.

During the State's case in chief, Gunther informed the court outside the presence of the jury that he intended to testify after the State rested its case. The court advised Gunther that if he took the witness stand, he would waive his Fifth Amendment right against self-incrimination. Gunther indicated that he was not aware of the provisions of the Fifth Amendment. The court then explained that the Fifth Amendment permits a person to refuse to answer a question on the ground that it could tend to incriminate the person and that because of such privilege, the State could not force Gunther to testify. The court further explained that if Gunther testified, the State could ask him questions, and that if such questions were relevant, Gunther would be required to answer. When asked if he understood what the court had told him, Gunther replied, "I understand that. I understand that." Upon Gunther's request, the court allowed standby counsel to conduct the direct examination of Gunther.

Gunther testified that he met Kennedy in Las Vegas, Nevada, in December 2002. Gunther owned a carnival company in Chicago, Illinois, and Kennedy owned one in Iowa. They met at a convention for persons in the entertainment business. At some point, Kennedy asked Gunther to come to Iowa to help run her carnival. In March 2003, Gunther moved to Iowa, where he managed Kennedy's carnival crew and helped move the carnival from site to site. He also owned some games and a ride in the carnival. He testified that he and Kennedy were "lovers" and that he had "moved in" with her in the fall of 2003.

On May 23, 2004, the carnival was set up near Offutt Air Force Base. Gunther and Kennedy were staying in a camping trailer that was parked in Council Bluffs, Iowa. Gunther testified that during the prior week, he and Kennedy had discussed ending their relationship after Kennedy told Gunther she had "slept with" another man. Gunther said he planned to move back to Chicago the following Monday, May 24.

In the afternoon or early evening hours of May 23, 2004, Gunther was packing his belongings at Kennedy's trailer. He testified that Kennedy then told him she was "sleeping with" three other men, including Zawodny. Gunther said he was "hurt" and "upset" when she told him about the other men.

When Gunther was asked whether he remembered any of the remaining events of May 23, 2004, he replied, "Not really." He thought he remembered talking to Davis on the carnival midway that evening. He said his first clear memory was when he woke up in jail after 3 weeks and kept asking himself why Kennedy had not come to visit him. He testified that he did not remember shooting Zawodny and that he was not aware that Kennedy was dead "until the police told me that I hurt her."

On February 18, 2005, a jury convicted Gunther of first degree murder and use of a firearm to commit a felony. The court sentenced Gunther to life imprisonment without the possibility of parole and to a period of 10 to 20 years' imprisonment on the firearm conviction, to be served consecutively.

## ASSIGNMENTS OF ERROR

Gunther claims the trial court erred (1) in allowing him to waive his right to counsel and to proceed to trial on his own; (2)

in allowing Gunther to proceed as his own counsel but not including him in all proceedings, such as sidebar conferences; (3) "in finding [Gunther] guilty beyond a reasonable doubt"; and (4) in imposing an excessive sentence of life imprisonment without the possibility of parole.

## ANALYSIS

### WAIVER OF COUNSEL

Gunther claims the trial court erred in allowing him to represent himself. Under U.S. Const. amend. VI and Neb. Const. art. I, § 11, a criminal defendant has the right to waive the assistance of counsel and conduct his or her own defense. *State v. Delgado*, 269 Neb. 141, 690 N.W.2d 787 (2005). In order to waive the constitutional right to counsel, the waiver must be made voluntarily, knowingly, and intelligently. *Id.* See, also, *Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). Under *Faretta*, it is not a requirement that formal warnings be given by the trial court to establish a voluntary, knowing, and intelligent waiver of the right to counsel. *Delgado, supra.* This court reviews the record to determine whether under the totality of the circumstances, the defendant was sufficiently aware of his or her right to counsel and the possible consequences of his or her decision to forgo the aid of counsel. See *id.* In determining whether a defendant's waiver of counsel was voluntary, knowing, and intelligent, an appellate court applies a "clearly erroneous" standard of review. *Id.*

Gunther claims the totality of the circumstances demonstrates that his waiver of the right to counsel was not made voluntarily, knowingly, and intelligently. He argues that the trial court's inquiry regarding his ability to represent himself was not meaningful and that he had no understanding of the law or the charges he was facing. He also claims that because he asked to waive his right to counsel, the court should have continued the trial to allow him time to prepare.

Gunther told the trial court: "I want to fire my attorneys." Before the request was granted, one of Gunther's attorneys informed the court that Gunther wanted to conduct the trial himself and that he had expressed this desire to his defense attorneys repeatedly. Gunther responded that this was in fact his intention.

The record supports the conclusion that Gunther voluntarily discharged his attorneys. Nothing in the record suggests that Gunther was promised or threatened in any way with regard to the discharge of counsel.

■ The record establishes that Gunther's waiver was made voluntarily and knowingly. Gunther had previously been represented by counsel, including at his arraignment and at hearings on various pretrial motions. He was represented on the day of trial by the Sarpy County public defender's office and two attorneys from Chicago. Prior to his request to proceed pro se, Gunther discussed with these attorneys his desire to represent himself. He also discussed this decision with his attorneys after the court granted his motion. After granting Gunther's motion to discharge his attorneys, the court appointed the attorneys to act as standby counsel. Standby counsel were present throughout Gunther's trial and sentencing, and they periodically conferred with him. Gunther requested that he be examined on direct by one of the attorneys appointed as standby counsel, and the court granted this request. In *State v. Wilson*, 252 Neb. 637, 564 N.W.2d 241 (1997), we found that the fact that a defendant has had the advice of counsel throughout his prosecution is an indication that his waiver of counsel and election to represent himself was knowing and voluntary. We find that Gunther voluntarily and knowingly waived his right to counsel.

We conclude Gunther's waiver was made intelligently in that he knew he would be representing himself and that prior to this request, Gunther understood that counsel had been appointed to represent him. Gunther claimed he was at odds with his attorneys because he wanted to seek the death penalty and his attorneys were not able to do so. The trial court explained that under Nebraska law, the death penalty could not be imposed because the State had not filed a notice of aggravating circumstances. Thus, the death penalty was not a possible punishment. Gunther insisted that the jury could give him a death sentence.

Gunther's professed reason for wanting to discharge his attorneys and represent himself was that his attorneys would not get him the death penalty, which is what he wanted. Gunther argues on appeal that he did not understand the law or the charges he was facing. Although Gunther expressed a lack of understanding

with regard to the death penalty, the record reflects that Gunther "understood what the court was telling him but disagreed with it." See *Wilson*, 252 Neb. at 652, 564 N.W.2d at 252. After the trial court explained that the death penalty was unavailable because no notice of aggravating circumstances had been filed, Gunther stated he did not understand. The court inquired as to the reason Gunther did not understand, and Gunther responded, "Because I want the death penalty." Gunther also stated that he did not "care" that the death penalty was not an option and that he wanted it anyway.

Later, the trial court again asked Gunther if he understood what he had been told regarding death penalty law. Gunther responded, "I understand what you're saying, but I understand what I want, too." After the court read the applicable statutes and explained again why the death penalty could not be imposed, Gunther told the court, "I don't care what you're saying."

With regard to Gunther's current argument that he did not understand the charges he faced, his representation to the trial court contradicts this assertion. During pretrial motions, the court informed Gunther that he had been charged with first degree murder and use of a firearm to commit a felony. When the court asked Gunther if he understood these charges, Gunther replied, "Yes."

This court has concluded that *Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975), does not hold that formal warnings must be given by the trial court to establish a voluntary, knowing, and intelligent waiver of the right to counsel. *State v. Delgado*, 269 Neb. 141, 690 N.W.2d 787 (2005). We have also rejected the claim that a formalistic litany is required to show such a waiver was knowingly and intelligently made. *State v. Green*, 238 Neb. 328, 470 N.W.2d 736 (1991). In *Green*, we noted that a knowing and intelligent waiver can be inferred from a defendant's conduct and that such a waiver could be made despite the trial court's failure to advise the defendant of the dangers and disadvantages of self-representation. A waiver of counsel need not be prudent, just knowing and intelligent. See *id.*

In *State v. Dunster*, 262 Neb. 329, 631 N.W.2d 879 (2001), we determined that the defendant had made a knowing and intelligent waiver of his right to counsel in that the trial court found him

to be competent. The defendant was aware of his right to legal representation and discussed self-representation with two attorneys. He was advised of the complexity of the evidentiary objections and the preservation of the objections, and he was informed he would be held to the same standard as a defendant represented by counsel. He was also advised by the trial court that it believed he was making a mistake by electing to proceed pro se.

In the present case, Gunther informed the trial court that he wanted to discharge his attorneys because they would not seek the death penalty. The court repeatedly explained to Gunther that the death penalty was not a possible penalty, to which he responded that he believed the court was in collusion with the prosecution and his attorneys. One of Gunther's attorneys then informed the court that Gunther did not want the assistance of counsel because he believed there was collusion to deny him the death penalty. Counsel informed the court that Gunther wanted to select and address the jury, wanted to examine and cross-examine the witnesses himself, and had repeatedly expressed these desires to his attorneys. Gunther acknowledged that this statement by counsel was correct and that he was asking to represent himself.

The trial court then proceeded to determine whether Gunther was sufficiently oriented to the proceedings and advised him that if he was allowed to proceed without counsel, he could not raise on appeal the fact that no counsel was provided to him. Gunther stated that he understood. The court generally outlined how the trial would proceed and informed Gunther that he would be the sole person for the defense to present evidence, examine witnesses, and make opening and closing statements. The court then found Gunther to be competent, granted his motion to discharge his attorneys, and appointed his attorneys as standby counsel.

Gunther argues that in contrast to *State v. Delgado*, 269 Neb. 141, 690 N.W.2d 787 (2005), the record does not demonstrate that Gunther had any experience in the courtroom. In *Delgado*, the defendant, Henry Delgado, was convicted of kidnapping, first degree sexual assault on a child, and being a felon in possession of a firearm. Before trial, Delgado filed a motion to discharge counsel and gave notice of his intent to proceed pro se. The motion was set for hearing, at which time the trial court examined Delgado regarding self-representation. The questioning revealed

Delgado felt that he had a fairly good understanding of the State's evidence, that he knew what defenses he could present at trial, and that he felt he could adequately cross-examine experts called by the State. He claimed that he had represented himself in federal court in habeas corpus proceedings; that he had sat through an entire jury trial, in which he was the defendant; and that he had reviewed the Nebraska rules of evidence and felt he had enough experience to make proper objections as needed. The trial court concluded Delgado had waived his right to counsel voluntarily, knowingly, and intelligently and appointed trial counsel to serve as standby counsel to assist if Delgado so desired.

On appeal, Delgado assigned as error the trial court's allowing him to waive his right to counsel. He claimed that the court had not offered enough warning regarding the consequences of his decision to proceed pro se and had not sufficiently ensured that he understood the consequences of his decision. He asserted that the advice and warnings given by the court were insufficient to render his waiver of counsel voluntary, knowing, and intelligent.

The issue is not whether Gunther was experienced enough to act pro se but whether he voluntarily, knowingly, and intelligently waived his right to have counsel represent him. This court reviews "the totality of the circumstances" appearing in the record. See *Delgado*, 269 Neb. at 147, 690 N.W.2d at 794. "[T]he key inquiry is whether the defendant was sufficiently aware of the right to have counsel and of the possible consequences of a decision to forgo the aid of counsel." *State v. Wilson*, 252 Neb. 637, 649, 564 N.W.2d 241, 251 (1997). The record before us indicates that Gunther knew and understood the charges against him. The trial court informed him of the possible sentences if he was convicted. The court questioned Gunther and found him competent to represent himself.

We conclude that Gunther was sufficiently aware of his right to have counsel. Three defense attorneys had already represented him in earlier related proceedings. The trial court told Gunther it was appointing his prior defense team as standby counsel. The U.S. Supreme Court has noted that standby counsel may be appointed "to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary."

*Faretta v. California*, 422 U.S. 806, 834, n.46, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). The record indicates that standby counsel was present throughout the trial and intermittently participated in the trial on Gunther's behalf.

We further conclude that Gunther was sufficiently aware of the possible consequences of a decision to forgo the aid of counsel. The trial court explained some of the procedural rules, and Gunther indicated he understood and would be bound by such procedures. He was informed of his responsibilities in selecting the jury and that he would be the sole person examining witnesses and presenting evidence for the defense. He understood that if allowed to represent himself, his right to appeal a conviction based on lack of representation would be limited. He conferred with defense counsel about his decision to proceed pro se, both before and after the court granted his request.

Gunther's remaining arguments under this assignment of error amount to assertions that his representation was ineffective. He points out that he did not object to questions asked by the prosecution or to any exhibits offered in evidence and that he asked few questions of the witnesses. Gunther further argues that to ensure a fair trial in light of his last-minute waiver of counsel, the trial court was required to continue the trial to allow him time to prepare, despite the fact that neither he nor standby counsel requested a continuance.

A defendant does not have a constitutional right to receive personal instruction from the trial judge on courtroom procedure. *State v. Green*, 238 Neb. 328, 470 N.W.2d 736 (1991). The Constitution does not require a court to take over chores for a pro se defendant that would normally be attended to by trained counsel. See *Green, supra.* A criminal defendant who proceeds pro se is held to the same trial standard as if he or she were represented by counsel, and it is not up to the trial court to conduct the defense of a pro se defendant. See *id.* A defendant who elects to represent himself or herself cannot thereafter complain that the quality of his or her own defense amounted to a denial of effective assistance of counsel. *Faretta, supra.*

It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But where the defendant will

not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly. . . . It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law.". . .

When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must "knowingly and intelligently" forgo those relinquished benefits.

*Faretta*, 422 U.S. at 834-35.

We conclude that Gunther knowingly, intelligently, and voluntarily waived his right to counsel. Under a "clearly erroneous" standard of review, the trial court was not clearly wrong in concluding that Gunther validly waived his right to counsel.

### ALLEGED EXCLUSION FROM SIDEBAR CONFERENCES

Gunther assigns as error that the trial court, after allowing him to proceed as his own counsel, excluded him from proceedings such as sidebar conferences. The record indicates that after opening statements, a sidebar conference was held outside the presence of the jury, but the record does not reflect what took place during that sidebar. The most that can be said is that the sidebar was requested by standby counsel, as opposed to Gunther. The record shows that Gunther actively participated, along with standby counsel, in other sidebar conferences held outside the jury's presence.

In order to determine whether a defendant's self-representation rights have been respected, "the primary focus must be on whether the defendant had a fair chance to present his case in his own way." *McKaskle v. Wiggins*, 465 U.S. 168, 177, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984). The U.S. Supreme Court has imposed two limits on the extent of standby counsel's unsolicited participation in a trial. First, "the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury." *McKaskle*, 465 U.S. at 178. Second, "participation by standby counsel without the defendant's consent

should not be allowed to destroy the jury's perception that the defendant is representing himself." *Id.*

There is no indication in the record that standby counsel's request for a sidebar conference destroyed the jury's perception that Gunther was representing himself. In addition, the record clearly demonstrates that although standby counsel was present and advised Gunther at times during the trial, Gunther was allowed to control the organization and content of his own defense, make his own motions, argue points of law, participate in voir dire, question witnesses, and address the court and the jury at appropriate points in the trial.

### FIRST DEGREE MURDER CONVICTION

Despite the language used in the assignments of error section of his appellate brief, Gunther argues later in the brief that the jury erred in finding him guilty beyond a reasonable doubt with regard to the conviction for first degree murder. In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Aldaco, ante* p. 160, 710 N.W.2d 101 (2006).

The elements of first degree murder as described in Neb. Rev. Stat. § 28-303 (Cum. Supp. 2004) state that a person commits murder in the first degree if he kills another person purposely and with deliberate and premeditated malice. See *State v. Harms*, 263 Neb. 814, 643 N.W.2d 359 (2002). The evidence, viewed most favorably to the State, shows that Gunther approached Zawodny and walked with him around the Skeeball game at the carnival. Gunther then shot Zawodny 11 times, although Gunther claimed he did not remember anything about the shooting.

Gunther's argument that the jury erred in finding him guilty of first degree murder because he had no memory of shooting Zawodny is without merit. When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecu-

tion, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Aldaco, supra.* When the sufficiency of the evidence as to criminal intent is questioned, independent evidence of specific intent is not required. Rather, the intent with which an act is committed is a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident. *Id.* The intent to kill may be inferred, sufficient to support a murder conviction, from the defendant's deliberate use of a deadly weapon in a manner likely to cause death. *State v. Keup,* 265 Neb. 96, 655 N.W.2d 25 (2003).

Gunther testified that he knew Kennedy owned firearms and that the weapons used to kill Zawodny belonged to her. Gunther knew where Kennedy kept the .38-caliber revolver, and he saw the .22-caliber pistol in her trailer on Sunday, May 23, 2004. Four eyewitnesses testified to the shooting of Zawodny at the carnival.

The jury listened to the witnesses, including Gunther, examined the evidence, and found that the State had proved beyond a reasonable doubt all the elements necessary to convict Gunther of first degree murder. After reviewing the evidence in a light most favorable to the State, we conclude that a rational trier of fact could have found the essential elements of first degree murder beyond a reasonable doubt. The properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the murder conviction and the conviction for use of a weapon to commit a felony.

### Sentence of Life Imprisonment Without Parole

Following Gunther's first degree murder conviction, the trial court sentenced him to life imprisonment without the possibility of parole. The death penalty could be sought against Gunther only if the information charging him had contained a notice alleging aggravating circumstances. See § 29-1603(2)(a). Since no notice was filed, Gunther's conviction for first degree murder was classified as a Class IA felony, and the court entered a sentence of life imprisonment without parole.

Gunther argues, and the State concurs, that the cause should be remanded for resentencing because the sentence of life imprisonment without the possibility of parole under Neb. Rev.

Stat. § 28-105(1) (Cum. Supp. 2004) was erroneous but not void under our holding in *State v. Conover*, 270 Neb. 446, 703 N.W.2d 898 (2005). As we explained in *Conover*, the amendment to § 28-105(1) in the 2002 Third Special Session was not related to or germane to any of the purposes for which the special session was called and had no natural connection to such purposes. Consequently, we held that "the Legislature lacked constitutional authority to amend the language of the statutory penalty for a Class IA felony during the 2002 special session." *Conover*, 270 Neb. at 452, 703 N.W.2d at 904.

■ This court has the power on direct appeal to remand a cause for the imposition of a lawful sentence where an erroneous one has been pronounced. *Conover, supra.* We remanded the cause in *Conover* with directions to resentence the defendant to life imprisonment on each of his two convictions. We explained this result in the following manner:

> In the context of our ex post facto analyses in *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003), and *State v. Gales, supra*, we concluded that the phrase "without parole," as employed in L.B. 1, was severable so as to permit resentencing to life imprisonment under the prior version of the statute if the death penalty was not imposed on remand. Moreover, for the same reason that the Legislature lacked constitutional authority to add the phrase "without parole" to § 28-105(1) during the 2002 special session, it also lacked authority to repeal the version of the statute then in existence which prescribed the penalty for a Class IA felony as life imprisonment. Thus, at the time of Conover's sentencing, the district court had statutory authority to impose a sentence of life imprisonment on each of the two counts of first degree murder, but it lacked authority to add the phrase "without parole." Consequently, the sentences were erroneous but not void. See *State v. Rouse*, 206 Neb. 371, 293 N.W.2d 83 (1980), and *Draper v. Sigler*, 177 Neb. 726, 131 N.W.2d 131 (1964) (both holding that indeterminate sentence imposed for crime, where not authorized by statute, is erroneous but not void). See, also, *State v. Alford*, 6 Neb. App. 969, 578 N.W.2d 885 (1998).

*Conover*, 270 Neb. at 452-53, 703 N.W.2d at 904-05.

Pursuant to our decision in *Conover*, we remand the cause with directions to resentence Gunther to life imprisonment on the first degree murder conviction.

## CONCLUSION

Under the totality of the circumstances, Gunther's waiver of his right to counsel was made voluntarily, knowingly, and intelligently. The trial court was not clearly wrong in finding that his waiver of counsel was valid. The properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support Gunther's convictions for first degree murder and use of a weapon to commit a felony, and the convictions are affirmed. Gunther's sentence to life imprisonment without parole was erroneous. Thus, we remand the cause with directions that the trial court resentence Gunther to life imprisonment as to the first degree murder conviction. The sentence of 10 to 20 years' imprisonment on the conviction for use of a firearm to commit a felony, to be served consecutively, is affirmed.

AFFIRMED IN PART, AND IN PART
REMANDED WITH DIRECTIONS.