State of Nebraska, appellee, v.
Marcus M. Escamilla, appellant.
___ N.W.2d ___

Filed June 19, 2015.    No. S-14-698.

1. **Criminal Law: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.

2. ____: ____: ____. The relevant question when an appellate court reviews a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

3. **Intent: Words and Phrases.** Deliberate means not suddenly, not rashly, and requires that the defendant considered the probable consequences of his or her act before doing the act.

4. **Homicide: Intent: Time: Words and Phrases.** The term "premeditated" means to have formed a design to commit an act before it is done. One kills with premeditated malice if, before the act causing the death occurs, one has formed the intent or determined to kill the victim without legal justification. No particular length of time for premeditation is required, provided that the intent to kill is formed before the act is committed and not simultaneously with the act that caused the death.

5. **Homicide: Intent: Time**. The time required to establish premeditation may be of the shortest possible duration and may be so short that it is instantaneous, and the design or purpose to kill may be formed upon premeditation and deliberation at any moment before the homicide is committed.

6. **Homicide: Intent: Circumstantial Evidence: Proof.** Deliberation and premeditation may be proved circumstantially.

7. **Homicide: Intent: Weapons.** Intent to kill may be inferred from deliberate use of a deadly weapon in a manner reasonably likely to cause death.
8. **Convictions: Evidence: Proof: Appeal and Error.** The law imposes a heavy burden on a defendant who claims on appeal that the evidence is insufficient to support a conviction.

Appeal from the District Court for Douglas County: JAMES T. GLEASON, Judge. Affirmed.

Alan G. Stoler, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

WRIGHT, CONNOLLY, STEPHAN, McCORMACK, MILLER-LERMAN, and CASSEL, JJ.

MILLER-LERMAN, J.

## NATURE OF CASE

Following a jury trial, Marcus M. Escamilla was convicted in the district court for Douglas County of first degree murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person. Escamilla appeals, claiming as his only assignment of error that there was insufficient evidence of premeditation to convict him of first degree murder. Because the record contains sufficient evidence to support the jury's verdict, we affirm his convictions and sentences.

## STATEMENT OF FACTS

Escamilla was convicted of first degree murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person in connection with the 2013 shooting death of Kenneth Gunia. He was sentenced to life imprisonment for his conviction of first degree murder, 5 years' imprisonment for his conviction of use of a deadly weapon to commit a felony, and 3 years' imprisonment for his conviction of possession of a deadly weapon by a prohibited person. Escamilla's sentences were ordered to be served

consecutively to each other, and he was given credit for 414 days of time served.

Evidence at trial generally indicated that on the night of April 16, 2013, Escamilla drove with Michele Willcoxon to an apartment complex located on 24th Street in Omaha, Nebraska, in order to meet up with Gunia. When they arrived at the apartments, Escamilla got out of Willcoxon's black sport utility vehicle (SUV) and met Gunia in the parking lot. They talked outside Gunia's car for a brief time before they both got into Gunia's car, where Escamilla shot and killed Gunia. Escamilla then walked back to Willcoxon's SUV, and she drove Escamilla back to his residence.

Escamilla was charged on July 17, 2013, with first degree murder in alternative theories of premeditated murder and felony murder, use of a firearm to commit a felony, and possession of a deadly weapon by a prohibited person. A jury trial was held May 6 through 9, 2014.

At trial, Willcoxon testified for the State. She said that at the time of Gunia's death, she knew Escamilla and Janella Marks, who lived with Escamilla, and that she had become recently acquainted with Gunia. Willcoxon testified that at the time, she was using methamphetamine "[a]ll the time," and that part of her relationship with Gunia was based on the use and sale of methamphetamine. On April 15, 2013, Willcoxon "fronted" Gunia some methamphetamine, and at the end of the day on April 15, Gunia owed Willcoxon $275 to $300.

Sometime in the early evening on April 16, 2013, Willcoxon went to the residence of Escamilla and Marks in order to use methamphetamine with Marks. Willcoxon testified that while she was with Marks, she was waiting for Gunia to call her to let her know that he had the money he owed her. Willcoxon told Marks that she had heard that Gunia was going to rob her. Escamilla heard this conversation, and Willcoxon testified that he told her "not to worry about it. He [Escamilla] would say something to him [Gunia]."

Sometime later that evening, Willcoxon left the residence of Escamilla and Marks in her SUV and she agreed to give

Escamilla a ride. Willcoxon testified that Escamilla was wearing a black sweater over a white T-shirt, black pants, black shoes, and a black hat.

Willcoxon and Escamilla drove to a few places, and during that time, Gunia texted Willcoxon and they arranged to meet at the apartment complex on 24th Street. Willcoxon and Escamilla arrived at the apartment complex at approximately 10 p.m., and when they got there, Willcoxon did not see Gunia right away, so she circled the parking lot a couple of times. When Willcoxon and Escamilla saw Gunia walking to his car, Escamilla got out of the SUV and walked toward Gunia. As Escamilla approached Gunia, Willcoxon heard Gunia say, "What? What? What did I do?" as he backed up against the driver's-side door of his car.

Willcoxon circled her SUV around the parking lot another time before parking. When she parked, Willcoxon saw Gunia sitting in the driver's side of his car and Escamilla squatting down next to the driver's-side door. Willcoxon testified that she did not constantly watch the activity going on between Escamilla and Gunia, but that at some point, she looked over and saw Escamilla in the driver's seat and Gunia in the passenger seat of Gunia's car. Willcoxon testified that she did not hear anything come from the car, but that at some point, Escamilla "jogged" back to her SUV and said they needed to go. Escamilla got in the passenger side of Willcoxon's SUV, and she drove them back to Escamilla's residence.

On the way to Escamilla's residence, Escamilla told Willcoxon that he had shot Gunia. Willcoxon testified that Escamilla stated, "'I shot that fool.'" When asked to describe Escamilla's demeanor when he said that, Willcoxon stated that "[h]e was okay with it. He was hyped up." Willcoxon testified that when Escamilla told her about what had occurred in Gunia's car, "[h]e kind of chuckled" and stated that Gunia "kept asking — saying that he just want[ed] to go upstairs to his kids."

Willcoxon stated that after they arrived at Escamilla's residence, she stayed for approximately 10 minutes before going

home. Willcoxon testified that she did not see Escamilla with a gun that night, but she stated that he was wearing loose-fitting clothing.

The State also called Thomas Williams to testify at trial. At the time of Escamilla's trial, there was a charge of criminal intent to distribute methamphetamine pending against Williams, and Williams was incarcerated at the Douglas County Correctional Center. Williams testified that he was acquainted with Escamilla through Escamilla's girlfriend, Marks, because Williams was friends with Marks' father.

Sometime after Williams was incarcerated, Escamilla was placed in the same unit at the Douglas County Correctional Center where Williams was placed, and Escamilla started talking to Williams. In connection with the death of Gunia, Escamilla asked Williams if he had ever heard "a gun pop in a car" and stated that he might be in trouble. Williams asked why, and Escamilla stated that he had "'killed a fool.'" Escamilla said he had killed Gunia inside a car in front of the residence of Gunia's girlfriend off of 24th Street. Escamilla told Williams that "since the gun was pushed uptight [sic] against him [Gunia], it was just like a whoosh inside the car." He also told Williams that he had "the piece up on [Gunia] so good . . . that it wasn't like a loud pop, bang. It was like a whoosh. Like an air — like an air release or something in the car." Williams testified that Escamilla indicated that he held the gun up to Gunia's abdominal area. Escamilla told Williams that after he shot Gunia, he "casually got out of [Gunia's] car," walking back to the SUV in which he had arrived, and he and Willcoxon drove away.

Amanda Wickersham, Gunia's girlfriend at the time of his death, was called to testify. At the time of Gunia's death, Wickersham and her two children were living in the apartment complex at the 24th Street location, and Gunia sometimes stayed at her apartment. Wickersham stated that she was aware of Gunia's drug use and that it had caused problems between them. Wickersham testified that on the night of Gunia's murder, April 16, 2013, Gunia had made dinner

and spent time with her children. After dinner, Wickersham lay down because she was not feeling well. Gunia lay down next to her for a little while, then he got up and left the room. After a while, Wickersham realized Gunia had not returned to the room, so she got up to look for him. Gunia was not in the apartment, but his coat was still there, so Wickersham called him.

Wickersham testified that when she dialed Gunia's cell phone number, the call was answered, but she did not actually converse with Gunia. She stated that she heard a man's voice who was not Gunia and that it sounded like there was "some kind of argument or tussle going on." She ended the call. Because she assumed there was something wrong, she went downstairs. When she got downstairs, she saw a man walking away from where Gunia's car was parked. She described the man as white or light skinned, wearing dark clothing, and between 5 feet 7 inches and 6 feet tall. Wickersham watched the man get into a dark SUV and leave.

Wickersham testified that she then ran to Gunia's car, where she found Gunia in the front passenger seat. Wickersham stated that the passenger car door was open, and Gunia's legs were outside the car. Wickersham nudged Gunia, and he reacted, so Wickersham called the 911 emergency dispatch service. Wickersham testified that there appeared to be a burn hole in Gunia's shirt on the left side of his abdominal area, but that she was "too scared to lift the shirt up to see what was underneath it." While she was waiting for the police to arrive, Wickersham stated that Gunia was unable to speak, but that he had "reach[ed] out" to her.

Lisa Stafford, Wickersham's neighbor at the apartment complex, was then called to testify. She stated that on the night of Gunia's murder, she was home studying. At approximately 10 p.m., Stafford was smoking a cigarette near her bedroom window that overlooked the apartment complex's parking lot. She observed two men in the parking lot near a white car, one wearing a white shirt and the other dressed in black. Stafford stated that the two men were standing "really

close to each other," which Stafford found to be "odd," so she watched them. Stafford described the man dressed in black as approximately 5 feet 7 inches tall and light skinned, either "white or Hispanic or native."

Stafford stated that she thought the man dressed in black was trying to make the man in the white shirt get into the driver's side of the white car. Specifically, she testified that Escamilla's conduct was aggressive and that "there was no way for the guy in the white shirt to go [anywhere] but into the car." Stafford stated she believed the man in the white shirt was nervous or drunk based on his body language. She stated that he was "kind of jittery or shaky or not fully stable." Stafford turned away for a moment, and when she looked back out the window, the two men were in the car. She heard a "pop" and a man's scream. She then observed the man dressed in black get out of the driver's side of the white car and walk across the parking lot to a black SUV. He got in the passenger side of the black SUV, and it drove away.

Stafford testified that she left her apartment and went downstairs to the white car, where she encountered Wickersham. She saw the man in the white shirt in the front passenger seat in the car. She stated that his white shirt appeared to be black on the side of his body. Stafford reached into the car to see if the man had a pulse; he then "took a big gasp of air . . . like he was trying to breathe." Stafford was there when the police arrived, and she gave a statement to the police that night.

The State then called Savannah Sharpe to testify. Sharpe stated that she met Gunia at a drug rehabilitation center in 2011. Sharpe stated that in April 2013, Gunia would call her every night to check on her and her children. On April 16, Sharpe was having a telephone conversation with Gunia at approximately 10 p.m., and Sharpe testified that her conversation with Gunia stopped when she heard another man approach Gunia, but that Sharpe stayed on the open line. Sharpe testified that she could hear the conversation between the two men and that during the conversation, Gunia's tone changed from confident to "more of a plea." Sharpe then

heard a sound as if the cell phone had been dropped or stepped on, which she described as sounding like "pow pow pow." Sharpe testified that after hearing the noises, she heard Gunia breathing and making a gurgling sound. After some time, Sharpe heard two women's voices and then sirens before the call was disconnected. Sharpe testified that the next morning, she learned that there had been a homicide at the apartment complex, so she called the police to report what she had heard.

Marks, Escamilla's girlfriend, also testified. She stated that in April 2013, she was living with Escamilla and knew Gunia through her father. Marks testified that at that time, she was using methamphetamine daily. On April 16, Willcoxon came to the residence of Escamilla and Marks to talk to Escamilla and, at some point, they left together. Marks testified that later that night, Escamilla returned to their residence with Willcoxon, and that after Willcoxon left, Escamilla told Marks that "he shot somebody." Marks testified that on that night, Escamilla was wearing all black and had a gun tucked into the waistband of his pants. Marks stated that after Willcoxon left, Escamilla placed the gun in a hole in the ceiling of their bedroom.

Marks stated that on the morning of April 17, 2013, U.S. marshals arrived at the residence of Escamilla and Marks. Marks testified that Escamilla told another person in the residence to retrieve the gun from the hole in the ceiling and to hide it in the wall of the shower in the basement bathroom. The U.S. marshals arrested Escamilla, and they searched the residence, but they did not find the gun. Marks found the gun after the marshals left, and she returned it to the hole in the ceiling.

Marks testified that Escamilla called her from jail soon after he was arrested and that he asked her to get rid of some clothes he had left in their bathroom. Marks told Escamilla she got rid of them, but, in actuality, she did not because she could not find the clothes. Marks testified that in their telephone conversation, Escamilla told her to sell his "car" so Marks

would have some money. Marks testified that at the time, Escamilla did not own a car and that by "car," he meant the gun. Marks sold the gun.

The State called Dr. Michelle Elieff, a general and forensic pathologist, to testify, and Dr. Elieff stated that she performed the autopsy on Gunia. She testified that Gunia had suffered a single gunshot wound, with an entrance wound in his left lower abdomen and an exit wound in his back. Dr. Elieff stated that the entrance wound had a ring of soot around it and that "[t]he ring of soot indicates a close range of fire. Inches perhaps."

The State rested, and Escamilla presented no evidence in his defense. At the close of evidence, Escamilla moved to dismiss the three counts against him and, specifically, the State's theory of felony murder. The State conceded that it did not present evidence with regard to the felony murder theory and requested that the court not instruct the jury as to felony murder. The court granted the motion to dismiss the theory of felony murder, and it did not instruct the jury as to felony murder; however, the court overruled Escamilla's motion with respect to the theory of premeditated murder and the other two counts, i.e., use of a deadly weapon to commit a felony and possession of a deadly weapon by a prohibited person. The jury was given a step instruction stating that Escamilla could be found guilty of first degree murder, second degree murder, intentional manslaughter, or unintentional manslaughter, or found not guilty.

Escamilla was convicted of first degree murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person. Escamilla moved for a new trial, which the district court overruled. After a sentencing hearing, the district court filed an order on August 4, 2014, sentencing Escamilla to life imprisonment for his conviction of first degree murder, 5 years' imprisonment for his conviction of use of a deadly weapon to commit a felony, and 3 years' imprisonment for his conviction of possession of a deadly weapon by a prohibited person. Escamilla's sentences

were ordered to be served consecutively to one another, and Escamilla was given credit for 414 days of time served.

Escamilla appeals.

## ASSIGNMENT OF ERROR

Escamilla contends that there was insufficient evidence of premeditation to support his conviction for first degree murder.

## STANDARDS OF REVIEW

[1,2] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. See *State v. Hale*, 290 Neb. 70, 858 N.W.2d 543 (2015). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See, *id.*; *State v. Juranek*, 287 Neb. 846, 844 N.W.2d 791 (2014).

## ANALYSIS

Escamilla asserts that the evidence adduced at trial was insufficient to support a conviction of first degree murder. Escamilla specifically contends that the evidence was insufficient to support a finding that the killing was done with deliberate and premeditated malice. Contrary to Escamilla's argument, we determine that there is sufficient evidence in the record to support the jury's verdict, and we therefore find no merit to this assignment of error.

Escamilla stands convicted of premeditated murder, which in Nebraska is a form of murder in the first degree. Pursuant to Neb. Rev. Stat. § 28-303 (Reissue 2008), a person commits this form of murder in the first degree if he or she kills another person purposely and with deliberate and premeditated malice. We have summarized the three elements which

the State must prove beyond a reasonable doubt to obtain a conviction for first degree murder as follows: The defendant (1) killed another person, (2) did so purposely, and (3) did so with deliberate and premeditated malice. *State v. Morgan*, 286 Neb. 556, 837 N.W.2d 543 (2013); *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013). A question of premeditation is for the jury to decide. *State v. Watt, supra*.

[3-5] With respect to the element of "deliberate and premeditated malice," our cases commonly look to the facts showing the planning of a murder and the manner in which the murder was carried out. Regarding planning we have stated:

> "'Deliberate means not suddenly, not rashly, and requires that the defendant considered the probable consequences of his or her act before doing the act. . . . The term "premeditated" means to have formed a design to commit an act before it is done. . . . One kills with premeditated malice if, before the act causing the death occurs, one has formed the intent or determined to kill the victim without legal justification. . . . No particular length of time for premeditation is required, provided that the intent to kill is formed before the act is committed and not simultaneously with the act that caused the death. . . .'"

*Id.* at 659, 832 N.W.2d at 474, quoting *State v. Nolan*, 283 Neb. 50, 807 N.W.2d 520 (2012). The time required to establish premeditation may be of the shortest possible duration and may be so short that it is instantaneous, and the design or purpose to kill may be formed upon premeditation and deliberation at any moment before the homicide is committed. *State v. Taylor*, 282 Neb. 297, 803 N.W.2d 746 (2011). Whether premeditation exists depends on numerous facts about "how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, *planning activity*." 2 Wayne R. LaFave, Substantive Criminal Law § 14.7(a) at 480 (2d ed. 2003) (emphasis in original).

Regarding the method of a murder, we have observed that the manner or fashion in which the injury is inflicted may show a deliberate act and hence serve as evidence to support a finding of premeditation. See *State v. Watt*, 285 Neb. at 659, 832 N.W.2d at 474 (stating that "the act of shooting an individual in the manner described by the witnesses in this case is inherently a deliberate act"); *State v. Nolan*, 283 Neb. at 74, 807 N.W.2d at 541 (stating that "[t]he act of shooting an individual, at least in the fashion described by [a witness], is inherently a deliberate act"). Other sources are in accord. See, e.g., 40A Am. Jur. 2d *Homicide* § 448 (2008) (stating that finding of premeditation may be supported by nature and number of victim's wounds or use of deadly weapon upon unarmed victim). Other courts agree that the manner of the murder can serve as evidence of premeditation. Thus, it has been stated that the fact finder may look to "facts about the *nature of the killing* from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design." *State v. Clark*, 739 N.W.2d 412, 422 (Minn. 2007) (emphasis in original), quoting *State v. Moore*, 481 N.W.2d 355 (Minn. 1992). See, also, 2 LaFave, *supra*.

[6] In a criminal case, the evidence upon which a jury may rely in making its findings may be direct, circumstantial, or a combination thereof. See *State v. Hale*, 290 Neb. 70, 858 N.W.2d 543 (2015). Deliberation and premeditation may be proved circumstantially. *State v. Beers*, 201 Neb. 714, 271 N.W.2d 842 (1978). In *State v. Kofoed*, 283 Neb. 767, 788-89, 817 N.W.2d 225, 242 (2012), we stated that "circumstantial evidence is not inherently less probative than direct evidence. In finding a defendant guilty beyond a reasonable doubt, a fact finder may rely upon circumstantial evidence and the inferences that may be drawn therefrom." It has been observed that premeditation may be established by circumstantial evidence, including the nature of the defendant's conduct before and after the killing. See 40A Am. Jur. 2d, *supra*.

Given the foregoing principles and remembering that on appeal after conviction, the evidence is viewed in a light most favorable to the State, we determine that there is sufficient evidence in this record to support the jury's finding beyond a reasonable doubt that Escamilla killed Gunia with deliberate and premeditated malice.

Although no one testified directly that they saw Escamilla arrive at the meeting with Gunia with a gun, the overwhelming evidence in the case shows that Escamilla brought a gun to the event. Further, there is no indication that Gunia had a gun. Willcoxon testified that when Escamilla first approached Gunia in the parking lot, Gunia backed up against the driver's-side door of his car and said, "What? What? What did I do?" A juror could infer from Gunia's reaction that Gunia saw that Escamilla was approaching him with a gun. Willcoxon testified that after Escamilla got out of Gunia's car and returned to her SUV, Escamilla told her, "'I shot that fool.'" Williams testified that Escamilla told him that he had "'killed a fool'" inside of a car. Marks testified that after Escamilla returned to their residence on the night of the shooting, Escamilla told her he had shot somebody, and that he then pulled a gun out of the waistband of his pants and hid it. Thus, there is considerable evidence that Escamilla arrived at the meeting with Gunia with a gun and that over the course of their encounter, if not before, Escamilla formed a design to kill Gunia with no legal justification.

Stafford, the neighbor of Gunia's girlfriend, Wickersham, testified that she observed Escamilla and Gunia in the parking lot the night of the shooting. She stated that Escamilla's conduct was aggressive and that "there was no way for [Gunia] to go [anywhere] but into the car." Stafford also testified that Gunia appeared to be nervous or drunk. After Stafford heard a "pop" and a man's scream, she observed Escamilla get out of the driver's side of Gunia's car and walk to Willcoxon's SUV. The evidence indicates that when Escamilla shot Gunia, Escamilla was in the driver's seat of Gunia's car and Gunia was in the passenger seat. Based on this placement and other

evidence, a juror could infer that Escamilla was in control of the situation by forcing Gunia to get into the driver's side of his car and to slide across to the passenger side, while Escamilla sat in the driver's seat. Escamilla's control of the situation indicates a deliberate plan unfolding that is indicative of premeditation.

Sharpe testified that she was on the telephone with Gunia the night of the shooting. She stated that when she heard another man, Escamilla, approach Gunia, her conversation with Gunia stopped, but that she stayed on the open line and overheard the conversation between the two men. Sharpe testified that during that conversation, Gunia's tone shifted from confident to "more of a plea." She then heard a sound as though the cell phone had been dropped and a "pow pow pow." After those noises, Sharpe heard what she described as Gunia's struggling to breathe.

As stated above, no particular length of time for premeditation is required, provided that the intent to kill is formed before the act is committed and not simultaneously with the act that caused the death. *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013). Furthermore, the time required to establish premeditation may be of the shortest possible duration and may be so short that it is instantaneous, and the design or purpose to kill may be formed upon premeditation and deliberation at any moment before the homicide is committed. *State v. Taylor*, 282 Neb. 297, 803 N.W.2d 746 (2011). The jury could infer from the testimony of Willcoxon, Williams, Marks, Stafford, and Sharpe that Escamilla's plan was unfolding and that Escamilla had sufficient time to form an intent to kill prior to shooting Gunia, and these facts would establish premeditation.

[7] A rational juror could also find that the manner in which Escamilla killed Gunia, i.e., the placement of the gun at close range to Gunia's torso, indicates a deliberate and premeditated killing with malice. With respect to the nature or manner of killing, it has been stated that "what is required [to show premeditation] is evidence (usually based upon examination

of the victim's body) showing that the wounds were deliberately placed at vital areas of the body." 2 Wayne R. LaFave, Substantive Criminal Law § 14.7(a) at 481 (2d ed. 2003). The Virginia Supreme Court has recognized that the placement of a gun that is used to shoot a victim may indicate premeditation. See *Stewart v. Com.*, 245 Va. 222, 427 S.E.2d 394 (1993). In *Stewart*, the Virginia Supreme Court stated that "evidence that a weapon was placed against a victim's head when the fatal shot was fired . . . is sufficient alone to support a finding that 'the shot was fired deliberately and with premeditation.'" *Id*. at 240, 427 S.E.2d at 406, quoting *Townes v. Commonwealth*, 234 Va. 307, 362 S.E.2d 650 (1987). Similarly, we have previously stated that intent to kill may be inferred from deliberate use of a deadly weapon in a manner reasonably likely to cause death. *State v. Watt, supra*. See, also, *State v. Iromuanya*, 272 Neb. 178, 719 N.W.2d 263 (2006); *State v. Gunther*, 271 Neb. 874, 716 N.W.2d 691 (2006).

The evidence shows that Escamilla shot Gunia on the left side of Gunia's abdomen from a close range. The shot was to the torso and was a "through-and-through wound," perforating the aorta. Dr. Elieff testified that the entrance wound from the bullet on Gunia's abdomen indicated that the shot was fired from inches away. Dr. Elieff observed a ring of soot around the wound. Furthermore, Williams testified that Escamilla told him that "the gun was pushed uptight [sic] against [Gunia]" and that "the piece was up on [Gunia] so good . . . that it wasn't like a loud pop, bang. It was like a whoosh." Based upon this evidence, a rational juror could infer Escamilla had formed the intent to kill from the deliberate use of a deadly weapon in a manner reasonably likely to cause death. See *State v. Watt, supra*.

The evidence also indicates that Escamilla was calm immediately after he killed Gunia. Calmness immediately after a killing has sometimes been associated with premeditation. See 40A Am. Jur. 2d *Homicide* § 448 (2008). Williams testified that after Escamilla shot Gunia, Escamilla "casually got out of the car" in which he had just shot Gunia and walked

back to Willcoxon's SUV, and they drove away. Willcoxon testified that as she and Escamilla were driving away from the scene, Escamilla told her, "'I shot that fool,'" and Willcoxon said that Escamilla's behavior showed that he "was okay with it." She also testified that when Escamilla told her what had occurred in Gunia's car, "[h]e kind of chuckled."

[8] The law imposes a heavy burden on a defendant who claims on appeal that the evidence is insufficient to support a conviction. See *State v. Nolan*, 283 Neb. 50, 807 N.W.2d 520 (2012). Faced with the trial record to which we have referred above, we determine that Escamilla has not carried that burden. Given the evidence, we determine that a rational trier of fact could reasonably infer that Escamilla formed an intent to deliberately kill Gunia before committing the homicide and, therefore, could have found beyond a reasonable doubt that Escamilla killed purposely and with deliberate and premeditated malice. The evidence is therefore sufficient to support entry of the jury's verdict of first degree murder.

## CONCLUSION

We conclude that the evidence is sufficient to support Escamilla's convictions, and we find no merit to his assignment of error on appeal. Therefore, we affirm the judgment of the district court.

Affirmed.

Heavican, C.J., not participating.