IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. WOODARD

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

GLENN A. WOODARD

Filed October 6, 2015.    No. A-14-1094.

Appeal from the District Court for Sarpy County: WILLIAM B. ZASTERA, Judge. Affirmed.

Michael J. Wilson and Jessica Douglas, of Schaefer Shapiro, L.L.P., for appellant.

Douglas J. Peterson, Attorney General, and George R. Love for appellee.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

MOORE, Chief Judge.

### INTRODUCTION

Glenn A. Woodard appeals from his conviction in the district court for Sarpy County of one count of witness tampering. On appeal, Woodard challenges the court's admission of an exhibit containing audio recordings of Woodard's purported telephone conversations with and concerning the witness at issue. Woodard also challenges the sufficiency of the evidence to support his conviction. Because the court did not err in admitting the exhibit in question and because the State provided sufficient evidence to support Woodard's conviction, we affirm.

### BACKGROUND

On October 9, 2013, in a separate county court case, the State filed a complaint charging Woodard with three counts of third degree domestic assault and one count of theft by unlawful taking, $200 or less. The State alleged that on October 8, Woodard intentionally and knowingly caused bodily injury to Natasha Guerrero, his intimate partner; that he threatened Guerrero with

imminent bodily injury; and that he threatened her in a menacing manner. The State also alleged that Woodard took or exercised control over certain property belonging to Guerrero. Woodard was arrested in connection with these charges on October 8.

On January 17, 2014, the State filed an information in the district court, charging Woodard in the present case with one count of witness tampering in violation of Neb. Rev. Stat. § 28-919 (Reissue 2008), a Class IV felony, for his actions occurring between October 8 and December 9, 2013.

A bench trial in the witness tampering case was held before the district court on September 12, 2014.

At trial, Chad Strong, the vice-president of account services for Synergy Telecom, testified that Synergy provides the telephone system used by inmates in the Sarpy County Jail and that Synergy uses a software platform called "Telemate" to supply the automated features of the phone system. The phone system automatically records everything other than attorney privileged phone calls. The phone system stores the audio recordings and data associated with each phone call on Synergy's off-site computer servers. Inmates are issued a "PIN number" and are required to record a "voice print" for verification when they first use the system. To connect calls, the software requires the inmate to enter the assigned PIN, and at regular intervals throughout the call, the phone system compares the original voice print associated with the inmate's PIN to the voice of the inmate then using the phone. Although "not 100 percent" accurate, the voice recognition system does not allow calls to connect if the voice of the inmate making the call does not match the voice print associated with that inmate's PIN "within a certain percentage." During the course of a phone call, if a different inmate takes the phone and begins speaking, the phone system notes this information in the electronic file associated with the call but does not shut down.

Lloyd Schoolfield, a deputy sheriff with the Sarpy County Sheriff's Department, serves as administrator for the Telemate phone call system at the jail. As administrator, he can search for and download electronic files containing audio recordings of phone calls made by inmates using the jail's phone system. His administrator access allows Schoolfield to search the files using criteria including destination phone number or inmate PIN to narrow his search. He can then download selected audio files and save them onto a compact disc. Schoolfield also prints off an "accompanying PDF attachment" that shows data about the downloaded files. When downloading and saving an audio file, he cannot modify it in any way and understands that an attempt to do so would corrupt the file, making it unusable. Schoolfield testified that generating compact discs of inmate phone calls is something he does "in the regular course of business of the Sarpy County Sheriff's Office." On cross-examination, Schoolfield clarified that the phone system itself determines whether the voice prints match for a particular call and that as administrator, he simply downloads recorded data based on particular search parameters and does not make any voice match determinations.

Schoolfield testified about exhibit 1, a compact disc with audio files of inmate phone calls and a printout listing the inmate, PIN, call time, duration, destination number, and station (phone from which the call was made) for each audio file on the disc. Schoolfield generated exhibit 1 on August 28, 2014. The disc contains the audio files of 18 phone calls made from the Sarpy County Jail between October 9, 2013 and January 10, 2014. When the State offered exhibit 1 into evidence,

Woodard's counsel objected as to foundation, stating further, "I understand the C.D. itself may come in, but I do have foundational objections to the contents of the C.D." The district court sustained the objection, stating, "You haven't even established that it's [Woodard]."

In response, the State asked Schoolfield to read into the record the information given by the audio file list for phone call numbers 5, 10, 15, and 18. As testified to by Schoolfield, the audio file list shows that calls 10, 15, and 18 were initiated by Woodard and were all made to the same destination phone number. Call number 5, however, is one of several calls on the audio file list made to a second destination phone number and the list identifies it as having been initiated by inmate Jae Swoboda. Schoolfield testified that the audio file for call number 5 came up in a search for calls made to that second destination phone number. He agreed that the audio files contained in exhibit 1 were placed on the disc during the regular course of his duties and that the disc was compiled "in the regular course of business that [he does] at the Sarpy County Sheriff's Department."

After this additional testimony, the State offered exhibit 1 "under 27-803(5) as a business record." Woodard's counsel objected again as to foundation, but the district court stated:

No. Over -- I'm going to receive it subject to the objection on the contents, you know, I haven't heard it. And for purposes of the trial I'm just going to, you know, I'm going to take it under advisement and then listen to it. Okay?

Upon inquiry from the prosecutor, the court clarified that it was receiving exhibit 1 only as to call numbers 5, 10, 15, and 18. Woodard's counsel then observed that, "specifically with call Number 5, the witness testified that that call was initiated by Jae Swoboda," to which the court replied, "Well, I'm taking your foundational objection . . . along with it."

James Munsey, a detective with the Bellevue Police Department, investigated allegations of possible witness tampering by Woodard. In particular, Munsey investigated whether Woodard had made any telephone calls from the jail to Guerrero, the alleged victim in the pending county court assault and theft case. Munsey testified that he spoke with Guerrero on December 11, 2013; with Woodard on December 16; and with Woodard's brother, Troy, on or about December 9 or 10, and that he was able to identify each of their voices based on those conversations. He later acknowledged that he did not speak to any of them over the phone and that his in-person conversations with them were brief.

Munsey identified the phone number Guerrero gave the Bellevue Police Department as being hers. During Munsey's investigation, Woodard was being housed at the Sarpy County Jail, pending further court action in the county court case. Munsey has access to the jail's Telemate system, and he searched the system for calls using Woodard's PIN made to Guerrero's number. He also searched more generally for all inmate calls made from the jail to Guerrero's number. When searching for calls made to Guerrero's number, Munsey determined that the first phone contact from the jail to that number was made on October 26, 2013 at "approximately 18:15 hours." Munsey testified, over Woodard's foundational objections, that Woodard was the caller and Guerrero was the recipient of the October 26 call. Munsey then testified that he had listened to exhibit 1. He identified Woodard and Troy as the individuals speaking in call numbers 10, 15, and 18 and Woodard and Guerrero as the individuals speaking in call number 5.

The State asked to publish exhibit 1 with respect to portions of calls 5, 10, 15, and 18. Woodard's counsel objected, stating:

> Judge, I would object on foundation. It's slightly different for each one. With regards to call number 5, based on the testimony that we've had so far, that call is listed, according to Exhibit Number 1, as to a Jae Swoboda with a different PIN number. I understand the phone number is one that this witness has stated is [Guerrero's] phone number, but that is not what it's reflecting on this audio file.
>
> With regards to the other three calls, those calls were testified as conversations between [Woodard] and another party, supposedly his brother, and I would object on foundation and relevance to those calls.

The district court responded, "All right. Well, just for purposes of the trial, I'll listen to those." When the prosecutor noted the court's previous reference to a "foundation problem," the court stated, "No. That foundation problem, you know, it comes in as a business record." The court also observed, "Then it goes to the credibility of it," and it assured the prosecutor that it would not make a decision without listening to the calls. The State played portions of the four calls for Munsey, who again identified Woodard and Troy as the participants in call numbers 10, 15, and 18 and Woodard and Guerrero as the participants in call number 5. We discuss the content of the calls as necessary to our resolution of this appeal in the analysis section below.

After the State rested at the conclusion of Munsey's testimony, Woodard's counsel moved for a directed verdict. The district court overruled the motion. Woodard rested without presenting evidence and renewed his motion, which the court took under advisement.

Following the parties' closing arguments, the district court took the matter under advisement, and on September 19, the court entered an order finding Woodard guilty of witness tampering. On December 1, the court sentenced Woodward to 1 to 3 years' imprisonment and granted him credit for 349 days served. Woodard subsequently perfected his appeal to this court.

## ASSIGNMENTS OF ERROR

Woodard asserts that the district court erred in (1) admitting exhibit 1 into evidence, (2) overruling his motion for directed verdict, and (3) finding the evidence sufficient to convict him of witness tampering.

## STANDARD OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the rules control the admissibility of evidence; judicial discretion is a factor only when the rules make discretion a factor in determining admissibility. *State v. Kofoed*, 283 Neb. 767, 817 N.W.2d 225 (2012).

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed

most favorably to the State, is sufficient to support the conviction. *State v. Collins*, 281 Neb. 927, 799 N.W.2d 693 (2011). The relevant question when an appellate court reviews a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Escamilla*, 291 Neb. 181, 864 N.W.2d 376 (2015).

ANALYSIS

*Admission of Exhibit 1.*

Woodard asserts that the district court erred in admitting exhibit 1 into evidence. He argues that the exhibit was not authenticated because there was insufficient foundation for Munsey's identification of the voices on the audio files in question.

Neb. Rev. Stat. § 27-901(1) (Reissue 2008) provides, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Section 27-901(1) does not impose a high hurdle for authentication or identification. *State v. Elseman*, 287 Neb. 134, 841 N.W.2d 225 (2014). A proponent of evidence is not required to conclusively prove the genuineness of the evidence or to rule out all possibilities inconsistent with authenticity. *Id.* If the proponent's showing is sufficient to support a finding that the evidence is what it purports to be, the proponent has satisfied the requirement of rule 901(1). *State v. Elseman, supra*.

Subsection 27-901(2) provides examples of methods of authentication or identification conforming with the requirements of the rule, including "(a) [t]estimony that a matter is what it is claimed to be," "(e) [i]dentification of a voice, whether heard first-hand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker," and "(i) [e]vidence describing a process or system used to produce a result and showing that the process or system produces an accurate result."

As foundation for the introduction of exhibit 1, the State presented testimony from Strong, who described how the Telemate system works; Schoolfield, who testified further about the Telemate system and the process he used in downloading and preserving the audio files on exhibit 1; and Munsey, who identified the voices of the speakers in the calls in question based on his in-person conversations with those individuals. It is clear from Strong and Schoolfield's testimony that the voice-print matching portion of the Telemate system is not foolproof and that while a call cannot be initiated if the caller's voice print does not match that on file for their PIN, inmates can and do trade PINs and can hand the phone to another individual once a call has been initiated. Although the system will check periodically for matches during each call, once the call has been successfully initiated, the call will not terminate if another individual begins speaking on the phone. Schoolfield thoroughly described the process he used in transferring the files in question to exhibit 1 and testified that the system would not allow him to alter any of the files during the process. Strong's testimony satisfied § 27-901(2)(i) by describing how the Telemate system works. Schoolfield's testimony satisfied § 27-901(2)(a) and (i) by describing the process he used in creating exhibit 1 and the inability to alter files downloaded to the CD. The evidence shows that call number 5 on exhibit 1 was placed to the phone number Guerrero had identified as being hers

and that calls 10, 15, and 18 on exhibit 1 were placed to a second number. Finally, although exhibit 1 shows that the PIN for another inmate was used to initiate call number 5, Munsey listened to the call and identified the speakers as Woodard and Guerrero based on his in-person conversations with them. Calls 10, 15, and 18 were placed to the second number and initiated through Woodard's PIN. Munsey identified the speakers on those calls as Woodard and Troy, again based on his in-person conversations with them. Munsey's testimony satisfied § 27-901(2)(e).

Woodard focuses on the brevity of Munsey's in-person contact with Woodard, Guerrero, and Troy, arguing that it was insufficient to allow him to be able to identify their voices on the audio files in question. These arguments go to the weight and credibility of Munsey's testimony, and this court does not assess witness credibility or reweigh the evidence as these are matters for the trial court.

The State provided sufficient foundation for Munsey's identification of the speakers on the audio files in question and sufficiently authenticated exhibit 1. Woodard's arguments are without merit.

*Sufficiency of Evidence.*

Woodard asserts that the district court erred in overruling his motion for directed verdict and finding the evidence sufficient to convict him of witness tampering.

Section 28-919(1) specifically provides:

(1) A person commits the offense of tampering with a witness or informant if, believing that an official proceeding or investigation of a criminal or civil matter is pending or about to be instituted, he or she attempts to induce or otherwise cause a witness or informant to:

(a) Testify or inform falsely;

(b) Withhold any testimony, information, document, or thing;

(c) Elude legal process summoning him or her to testify or supply evidence; or

(d) Absent himself or herself from any proceeding or investigation to which he or she has been legally summoned.

A person who has knowledge of a relevant fact or occurrence sufficient to testify in respect to it is a witness for purposes of the witness tampering statute, § 28-919. *State v. Cisneros*, 248 Neb. 372, 535 N.W.2d 703 (1995).

In his arguments, Woodard focuses on call number 5 on exhibit 1, the October 26, 2013 call identified as being between Woodard and Guerrero. Call number 5 is between a male and female speaker, and for purposes of this discussion, we have referred to the male speaker as Woodard and the female speaker as Guerrero. During the first portion of the call, Woodard explains that the situation he is in is "hurting so many more people than just me" and that it is "killing my whole family." He tells Guerrero, "All I'm asking you to do is make this right," and, "I really, really need this paper." They then discuss the logistics of Guerrero preparing a statement to recant what she previously told the police. Woodard tells Guerrero exactly what to say in her statement. At multiple points during the conversation, Guerrero expresses concern that she might get into trouble, and Woodard assures her that she will not. After they discuss the details of the

statement, Guerrero asks if she will have to appear in court, be subpoenaed, need to show up and what to do "after this." Woodard responds that she will have to do "[n]othing" and that [i]f you do this, don't . . . go to court." He also tells her not to go if she is subpoenaed and states, "This'll be enough to . . . to finish it and it'll be done." He again assures Guerrero that nothing will happen to her and that he does not think she will be subpoenaed. Guerrero then states, "I'm not gonna go. I've already . . . I've already actually talked to somebody about, uh, a coworker actually, he um, he did the same thing and his girl did, actually his wife, um, did the same exact thing and she never showed up and she did not get in trouble." Woodard again reassures her that "they won't do anything to you if you don't show."

The balance of call number 5 appears to be a discussion about a relationship Guerrero had with another individual. In his brief, Woodard asserts that in this final portion of the conversation, Guerrero admits that she lied to the police previously and that she is not ashamed for having done so. We disagree. When call number 5 is listened to in its entirety, it is apparent that these statements by Guerrero are in reference to the conversation about her relationship with another individual and are not about her previous statement to the police.

We have also reviewed calls number 10, 15, and 18 on exhibit 1, which were identified as being between Woodard and Troy. During these conversations, the two male speakers discuss the logistics of obtaining a statement that will help Woodard and getting a woman to sign the statement while she is feeling guilty.

Woodard argues that the evidence did not show that he enticed or persuaded Guerrero to absent herself from a legal proceeding because she had already decided not to attend court based on the advice of a coworker. He also argues that her question about whether she needed to go to court was conditioned upon her submitting an affidavit stating that she lied to the police earlier. He further argues that his response to this question was conditional in that his advice not to go to court was conditioned on the presumption that Guerrero's affidavit would conclude the case and that there would no longer be a pending criminal matter. Finally, Woodard argues that the State did not introduce evidence that the affidavit discussed by Woodard, Troy, and Guerrero on exhibit 1 would contain false testimony and that there was no evidence that Guerrero had been legally summoned to a court proceeding.

Woodard's arguments are without merit. The evidence shows that Woodard asked Guerrero to "make this right" and present a statement that her previous statement to the police was false. He also asked her not to go to court if she was subpoenaed. The evidence suggests that Woodard used another inmate's PIN in an attempt to hide his request to Guerrero. Woodard repeatedly assured Guerrero that nothing would happen to her if she made this statement and made emotional pleas to show how important the statement was to him. Woodard's conversations with Troy show his belief that a statement from Guerrero with respect to the charges at issue in state court would have an impact on issues Woodard was facing in federal court. With respect to whether Guerrero's original statement to police or the one Woodard attempted to solicit from her was false, matters of credibility are for the trial court. When viewed in the light most favorable to State, the evidence supported Woodard's conviction for violating § 28-919(1). The court did not err in overruling the motion for directed verdict or in finding Woodard guilty.

## CONCLUSION

The district court did not err in admitting exhibit 1 or in overruling Woodard's motion for directed verdict. The evidence was sufficient to support Woodard's conviction for witness tampering.

AFFIRMED.