IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. SUMMAGE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

LENADO S. SUMMAGE, APPELLANT.

Filed November 17, 2015.    No. A-15-005.

Appeal from the District Court for Douglas County: W. RUSSELL BOWIE III, Judge.
Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Cheryl M. Kessell for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

PIRTLE, RIEDMANN, and BISHOP, Judges.

PIRTLE, Judge.

### INTRODUCTION

Lenado S. Summage appeals his conviction and sentence for first degree sexual assault in the district court for Douglas County. He contends that there was insufficient evidence to support a conviction, that the trial court erred in admitting hearsay evidence, and that his sentence is excessive. Having found no merit to Summage's arguments, we affirm.

### BACKGROUND

On July 3, 2013, the State filed an information charging Summage with first degree sexual assault. The victim, F.G., was a 16 year-old female. Summage pled not guilty and a jury trial was held in September 2014.

The evidence at trial showed that on April 6, 2013, F.G. had an argument with her stepmother at their home and decided to run away. She took several items with her including $12 cash, razorblades, and her antidepressant medication. F.G. testified that she packed razorblades because she had been "self-harming" for a while, i.e. cutting herself with razorblades. She also testified that she had been taking her antidepressant medication as prescribed and that it did not affect her ability to remember things.

F.G. left her house around 11:30 p.m. and walked to a Kwik Shop gas station located at 72nd Street and Crown Point Avenue, Omaha, Nebraska. She entered the Kwik Shop, bought two energy drinks, and used the restroom.

Around the same time that F.G. was at the Kwik Shop, Summage entered the Kwik Shop. Summage briefly spoke with one of the cashiers, Amanda Jimerson, and then exited the store. Jimerson knew Summage because he was a frequent customer at the Kwik Shop and she often spoke to him when he came into the store. Jimerson testified that she did not know Summage's full name but knew him as "Leo." She testified that on the evening of April 6, 2013, Summage was wearing eye glasses and a distinctive "Jordan" hat. Jimerson also testified that she knew Summage had tattoos "all up his arm" and possibly on his neck. However, Summage was wearing a long-sleeved shirt on April 6.

Jimerson walked outside with Summage to see his new car, which was parked in front of the entrance. Jimerson testified the car was a gold two-door model with in-transit signs in the front and back windows. While outside, Summage and Jimerson talked about the car and the upcoming birth of Summage's daughter.

While Jimerson and Summage were standing by Summage's car, F.G. exited the Kwik Shop and began walking south. F.G. testified that she heard a man ask her how she was doing. When she looked back to say "fine," she noticed an African-American male standing next to a car talking to a woman, but did not recognize either of them. At that point, Summage told Jimerson that he should give "that girl" a ride because she should not be walking by herself that late at night. Jimerson responded by calling Summage a "weirdo." Although F.G. did not hear what Summage and Jimerson were talking about, she heard Jimerson say "what a weirdo" and assumed the comment was directed at her. F.G. walked south through the parking lot and past nearby apartment garages before eventually heading south on 72nd Street. Jimerson testified that at that point, she lost sight of F.G. and she re-entered the Kwik Shop and returned to her cash register.

A few minutes later, Summage got in his car and left the Kwik Shop parking lot, turning left onto Crown Point Avenue and then turning left onto 72nd Street and heading south.

Shortly after F.G. left the Kwik Shop, a car pulled up next to her while she was walking south on 72nd Street. The car initially had been traveling south on 72nd Street the same direction F.G was walking, but made a U-turn and pulled up next to her. F.G. noted the car had two doors and appeared to be dark in color; however it was close to midnight and the lighting was not very good.

F.G. testified that the driver and sole occupant of the car was an African-American male who was wearing glasses. The man, who was later identified as Summage, asked F.G. where she was going, and F.G. told him that she wanted to go to Wal-Mart. Summage offered to give F.G. a ride and she accepted.

After F.G. got in the car, Summage drove to a neighborhood near 78th Street to meet a friend. During the drive, F.G. and Summage engaged in conversation. F.G. disclosed that she had run away from home. Summage asked her how old she was, if she drank or used drugs, and why she ran away. F.G. told Summage that she was 16 years old, did not drink or use drugs, and had runaway because she was looking for an adventure. At some point during the drive, Summage told F.G. that his name was "Leo." He further told her that Leo was short for his actual name and told her what it was. He also offered to let F.G. look at his driver's license, but she did not look at it because "it seemed weird." F.G. testified that she could not remember what the name Leo was short for, but knew that it was something unusual.

When F.G. and Summage arrived in Summage's friend's neighborhood, he tried calling the friend, but the friend did not answer. They remained in the neighborhood for approximately five minutes and then left. When F.G. again told Summage that she wanted to go to Wal-Mart, Summage said Wal-Mart was far from where they were and that he wanted money for gas. F.G. gave him $4 and some change and he drove to a gas station. Summage did not put gas in his car, but instead went inside the gas station and bought something. F.G. did not know what he bought. When he returned, F.G. again told Summage that she wanted to go to Wal-Mart, at which time Summage asked F.G. if she knew how to make money. F.G. construed the question as a request for sex and said "no." Summage then told F.G. that because Wal-Mart was far away, she would have to give him something to get there. F.G. again construed Summage's statement as a request for sex and she said "no." Summage next asked F.G. if she knew where they were. She said that she did not know and she attempted to get out of the car. When F.G. opened the passenger door and started to get out, Summage grabbed her and pulled her into the car. Summage told F.G. that she could "either give it to [him] or [he] can take it." Summage then drove to a nearby parking lot. While Summage drove, he held onto F.G. as she tried to get away. After pulling into the parking lot, which was dark and had little lighting, Summage threw F.G. into the backseat. She landed on her back with her head on the driver's side of the car. Summage then climbed into the backseat and was in a kneeling position over F.G. F.G. attempted to push Summage away and get out of the car, but he told her that if she fought him he would "fuck [her] up." Summage removed his long-sleeved shirt and then pulled down F.G.'s pants and underwear far enough to remove one pant leg and one side of her underwear. Summage then pulled his pants and underwear down and told F.G. "[she] was lucky . . . that [he] was doing it and not someone else because he was going to use a condom." Summage then tore open a condom and threw the wrapper on the back dash of the car. Summage attempted to penetrate F.G.'s vagina with his penis but was unsuccessful at first, which F.G. testified was painful. F.G. told Summage to stop, but he did not. F.G. testified that Summage repositioned her on the backseat and successfully penetrated her vagina with his penis. She also testified that Summage may have used saliva to lubricate her, but she was not sure. F.G. testified that as this was happening, Summage reminded her that she told him she was looking for an adventure. After Summage was done, he put his clothes on, exited the car through the passenger-side back door, and walked around to the driver's side of the car and got in. F.G. put on her pants and climbed back into the front passenger's seat. She testified that she did not try to run away from Summage because she was scared and did not know where she was.

After F.G. and Summage were both back in the front seat of the car, Summage told F.G. that men would pay $300 to have sex with her. Summage also told F.G. he would take her to the

bus station and buy her a ticket to Chicago. She had told Summage prior to the assault that she liked Chicago.

Around 1 or 2 a.m. on April 7, 2013, Summage dropped F.G. off at the bus station. He gave her a phone number and told her to call that number to get the confirmation number for the bus ticket. After F.G. was at the bus station for an hour she called the phone number Summage gave her. She testified that someone answered, but told her she had the wrong number. F.G. testified that she felt hopeless and decided to try to kill herself by swallowing about 15 of her antidepressant medication pills. Shortly after taking the pills, F.G. became ill and vomited. She later purchased food from the vending machines with the $3 she had left, and called her ex-boyfriend from a pay phone, but he did not answer.

F.G. did not tell anyone in the bus terminal that she had been sexually assaulted because she did not want anyone to know she had run away. She thought that if she told someone about the assault, she would have to go back home, which she did not want to do.

Around 9 p.m. on April 7, 2013, approximately 19 to 20 hours after being dropped off at the bus station, F.G. was approached by a security guard. After initially lying to the security guard, F.G. told him her name and he contacted the Omaha Police Department.

Shortly thereafter, Omaha Police Officer Sean Quinlan and his partner arrived at the bus terminal. Quinlan spoke with F.G. for about an hour, initially asking general questions about her running away from home. Quinlan noted that F.G. was really quiet and timid and was not making much eye contact. As Quinlan continued talking with F.G., she became more emotional and appeared visibly shaken. F.G. eventually disclosed the assault to Quinlan. F.G. advised Quinlan that her attacker was clean-shaven, wore glasses, had short hair, a stocky build, and drove a gray-colored car. Based on the information F.G. provided to Quinlan, F.G. was transported to a hospital for a sexual assault exam.

Once F.G. arrived at the hospital, she and her parents met with Jennifer Tran, a sexual assault nurse examiner. Tran explained her role in providing medical care and conducting a forensic examination. After obtaining F.G.'s medical history from F.G. and her parents, Tran asked F.G. to describe the assault. Tran testified that it is important to receive an accurate account of the assault for purposes of diagnosis and treatment. Tran also advised that it is important to know who assaulted the victim because there is a need to ensure the perpetrator is not a family member and it also guides the care plan in terms of treatment for sexually transmitted diseases. F.G. gave Tran a history of the assault, and Tran testified that she relied on its accuracy for treatment and diagnosis.

Over Summage's hearsay objection, Tran testified that F.G. told Tran she had run away from home and had been picked up by an African-American male, who said his name was "Leo." F.G. said as they drove, Summage first tried to force her onto his lap, and then pushed her into the backseat. F.G. said she remembered being somewhere near 78th Street and the interstate in a parking lot, where Summage got into the backseat with her and pulled off one of her pant legs and one side of her underwear. F.G. told Tran that Summage said he would hurt her or beat her if she tried to fight him. Tran testified that F.G. told her that Summage then pulled down his pants, put on a condom, and tried to penetrate her vaginally with his penis. F.G. told Tran that Summage was unsuccessful at first and that it hurt, but that he continued to try and was eventually successful. F.G. said Summage stopped on his own and put on his clothes. He then told her that he would buy

her a bus ticket to Chicago and he took her to the bus station and dropped her off. F.G. told Tran that she was at the bus station the entire day, until a police officer approached her and asked if she was a runaway.

After F.G. described the assault to Tran, Tran did a physical examination of F.G. During the exam, Tran went over F.G.'s body with a Wood's lamp, a luminescent blue-light source that identifies bodily fluids typically invisible to the naked eye. Tran identified a glowing area on F.G.'s right buttock, which she swabbed and placed in the sexual assault kit. Tran then combed F.G.'s pubic hair, collected vaginal and anal swabs, and conducted a pelvic exam. During the pelvic exam, Tran noticed a tear near the opening of F.G.'s vagina, which appeared to be fresh. Tran testified that the type and location of vaginal tear suffered by F.G. is a common injury found in sexual assault victims. Tran stated that based on her training and experience, the results and findings of her examination were consistent with F.G.'s history of the assault.

After Tran completed the exam, she collaborated with a physician to discuss a treatment plan for F.G. F.G. was then provided treatment for potential sexually transmitted diseases. Tran also testified that she was concerned about F.G.'s mental health because she had fresh cut marks from a razor, so a behavioral health consult was ordered. F.G. was subsequently admitted to inpatient psychiatric care.

The sexual assault kit collected from F.G. was sent to a laboratory for testing done by Joseph Choquette. Three samples were tested: vaginal swabs, a swab from the glowing area on F.G.'s buttocks, and F.G.'s underwear. Choquette determined the vaginal swabs contained a full DNA profile from a single female source. Choquette noted that the use of a condom during intercourse greatly reduces the likelihood of locating a second source in a vaginal swab. He further testified that when no semen is present, the overwhelming number of female cells in a vaginal swab make it difficult to generate a male profile off of skin cells or saliva alone.

Testing done on the swab from the glowing area on F.G.'s buttocks yielded a partial DNA profile, but the profile was inconclusive and a contributor could not be determined. Testing done on the waistband of F.G.'s underwear identified the presence of two DNA profiles and F.G. was the major contributor. The minor contributor's DNA profile did not contain enough information to make a conclusive finding.

Omaha Police Officer Sarah Spizzirri was assigned to the investigation and interviewed F.G. on April 17, 2013. F.G. provided Spizzirri with a description of the man who had sexually assaulted her. F.G. said her attacker wore glasses, was bald or balding, and drove a dark-colored two-door car. F.G. told Spizzirri she did not see any tattoos on her attacker because it was too dark.

During her investigation, Spizzirri obtained video surveillance footage from inside and outside the Kwik Shop on April 6, 2013. The DVD containing the surveillance was entered into evidence. Spizzirri also spoke with Jimerson, who provided information regarding the car and identified the person from the surveillance footage as "Leo." Using the name "Leo" and a picture taken from the surveillance footage, Spizzirri was able to identify Summage as the suspect. Spizzirri showed F.G. a photo lineup with six pictures, which included a photo of Summage that was 8 years old. F.G. was unable to identify her attacker from the photo lineup. F.G. did identify Summage as her attacker at trial.

At the conclusion of the State's evidence, Summage motioned to dismiss the case based on insufficient evidence, which the trial court overruled. The case was submitted to the jury and it

returned a guilty verdict. The district court accepted the jury's verdict and subsequently sentenced Summage to 25 to 30 years' imprisonment.

## ASSIGNMENTS OF ERROR

Summage assigns that the trial court erred in (1) failing to grant his motion to dismiss at the close of the State's case because the State presented insufficient evidence to support a conviction, (2) admitting hearsay evidence regarding the assault, and (3) imposing an excessive sentence.

## STANDARD OF REVIEW

In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. McIntyre*, 290 Neb. 1021, 863 N.W.2d 471 (2015). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *State v. Vigil*, 283 Neb. 129, 810 N.W.2d 687 (2012). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. *Id.*

Apart from rulings under the residual hearsay exception, we will review for clear error the factual findings underpinning a trial court's hearsay ruling and review de novo the court's ultimate determination whether the court admitted evidence over a hearsay objection or excluded evidence on hearsay grounds. *State v. Vigil, supra.*

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Berney*, 288 Neb. 377, 847 N.W.2d 732 (2014). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## ANALYSIS

*Sufficiency of Evidence.*

Summage first argues that the evidence was insufficient to support a conviction for first degree sexual assault. The evidence upon which a jury may rely in making its findings may be direct, circumstantial, or a combination thereof. *State v. Escamilla*, 291 Neb. 181, 864 N.W.2d 376 (2015). Circumstantial evidence is to be treated the same as direct evidence, and the State, upon review, is entitled to have all conflicting evidence, direct and circumstantial, and the reasonable inferences which can be drawn from the evidence viewed in its favor. *State v. Sexton*, 240 Neb. 466, 482 N.W.2d 567 (1992).

Pursuant to Neb. Rev. Stat. § 28-319 (Reissue 2008), "[a]ny person who subjects another person to sexual penetration without the consent of the victim . . . is guilty of sexual assault in the first degree." Summage does not dispute that F.G. was sexually assaulted. Rather, he claims the evidence was insufficient to show that he was her assailant because (1) neither he nor his vehicle matched the description provided by F.G., and (2) his DNA was not found on F.G.'s person or on her clothing.

Summage first contends that F.G.'s description of her assailant did not match his physical characteristics. The video surveillance from the Kwik Shop on April 6, 2013, shows that Summage was a stocky, African-American male with a thin or partial goatee and clean-shaven cheeks. He was wearing glasses, a long-sleeved shirt, and a baseball cap. Jimerson also testified that on the day in question, Summage was wearing glasses and a "Jordan" hat. She also testified that she knew he had tattoos "all up his arm" and possibly a couple on his neck.

F.G. told Quinlan that her attacker was clean-shaven, rather than describing him as having some facial hair. She also did not mention the man having a hat. However, a hat is easily removable. F.G.'s description of her attacker matches Summage in other regards. F.G. testified that her attacker was an African-American male who was wearing glasses. She also testified that he was wearing a long-sleeved shirt, which he took off before assaulting her. F.G. also told Quinlan that her attacker had a stocky build. Although F.G. told Spizzirri that she did not see any tattoos on her attacker, she also said that it was dark in the parking lot where the assault occurred.

Summage also points out that F.G. was unable to pick him out of a photo lineup. While this is true, Spizzirri testified that the photo of Summage used in the lineup was 8 years old. Further, F.G. identified Summage as her assailant after personally observing him in the courtroom at trial. She explained that she was able to identify him at trial but not in the photo line-up because the lighting in the pictures was different.

In regard to his vehicle, Summage argues that the surveillance video from the Kwik Shop shows that he was driving a metallic, gold colored car with no front license plate. Further, Jimerson testified that Summage was driving a gold, two-door car with in-transit signs in the front and back windows. F.G., on the other hand, testified that the car was a two-door, dark colored vehicle, and that she did not notice any in-transit signs on the vehicle. She also acknowledged that she told police officers that the car was gray, and testified at her deposition that it was not a metallic car.

However, the only time F.G. saw the outside of Summage's vehicle was before she got in. She testified that the lighting was not very good at the location where Summage picked her up. She also testified that when the car pulled up next to her, she was not paying attention to the exterior color of the car. Once F.G. got into the vehicle, she remained inside the vehicle until Summage dropped her off at the bus station. Further, Officer Quinlan testified that F.G. told him the car was gray and that based on a photo of Summage's car from the surveillance video, Quinlan testified he would describe the car as "possibly a gold or a gray, silver."

Any discrepancies in F.G.'s description of Summage's physical characteristics or his vehicle were for the jury, as the trier of fact to resolve. See *State v. McIntyre*, 290 Neb. 1021, 863 N.W.2d 471 (2015) (an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact).

Summage also argues that the evidence is insufficient because his DNA was not found on F.G.'s body or her clothing despite F.G.'s assertion of vaginal penetration with his penis and

lubrication of her vagina with his saliva. However, the fact that his DNA was not found, does not equate to a finding that he was not F.G.'s attacker. No complete DNA profile was found on the items tested other than F.G.'s own DNA. There were partial DNA profiles found on F.G.'s buttocks and underwear but a contributor could not be identified. Choquette testified that the use of a condom would greatly reduce the likelihood of locating a second DNA source in a vaginal swab. He further testified that when no semen is present, the overwhelming number of female cells in a vaginal swab make it difficult to generate a male profile off of skin cells or saliva alone. The failure to find Summage's DNA on F.G.'s person or clothing does not mean the evidence was insufficient. There was other competent evidence to support a finding that Summage committed the crime.

Summage was standing outside the Kwik Shop talking to Jimerson when F.G. exited the store. Jimerson testified that she knows Summage as "Leo." Summage asked F.G. how she was doing and suggested to Jimerson that he should give F.G. a ride because he did not think she should be walking by herself. A few minutes later, Summage got into his vehicle, left the Kwik Shop parking lot, and headed south on 72nd Street--the same street and direction F.G. was walking. Shortly thereafter, a man matching Summage's general physical description pulled up next to F.G. in a two-door vehicle and offered to give her a ride. Once F.G. was inside the vehicle, the man said his name was "Leo" and explained that Leo was short for another name. F.G could not remember the actual name, but knew it was something unusual. Summage's first name is "Lenado." The man subsequently sexually assaulted F.G. and then took her to the bus station. F.G. identified Summage at trial as the man who picked her up and assaulted her. Viewed in the light most favorable to the prosecution, the evidence was sufficient to support Summage's conviction.

*Hearsay Evidence.*

Summage next assigns that the trial court erred in admitting hearsay evidence regarding the assault. Specifically, he argues that the trial court erred in allowing Tran to testify, over Summage's objection, about statements F.G. made to Tran during the sexual assault examination describing the assault.

Summage argues that Tran's testimony was hearsay and was not admissible under the medical exception to the hearsay rule because the statements were not made for purposes of medical diagnosis or treatment as required by Neb. Rev. Stat. § 27-803(3) (Cum. Supp. 2014). Section 27-803(3) provides a hearsay exception for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Rule 803(3) is based on the notion that a person seeking medical attention will give a truthful account of the history and current status of his or her condition in order to ensure proper treatment. *State v. Vigil*, 283 Neb. 129, 810 N.W.2d 687 (2012).

In order for statements to be admissible under rule 803(3), the party seeking to introduce the evidence must demonstrate (1) that the circumstances under which the statements were made were such that the declarant's purpose in making the statements was to assist in the provision of medical diagnosis or treatment and (2) that the statements were of a nature reasonably pertinent to medical diagnosis or treatment by a medical professional. *Id.* However, the statement need not be solely for the purpose of medical diagnosis or treatment; a statement is generally considered admissible under the medical purpose hearsay exception if gathered for dual medical and

investigatory purposes. See *id.* The fundamental inquiry is whether the statement, despite its dual purpose, was made in legitimate and reasonable contemplation of medical diagnosis or treatment. *Id.*

In *State v. Vigil, supra*, the Court held that statements made by a child victim of sexual abuse to a forensic interviewer in a medical setting may be admissible under rule 803(3) even though the interview has the partial purpose of assisting law enforcement's investigation of the crimes.

In the present case, F.G. agreed to go to Methodist Hospital to undergo a sexual assault examination. Upon arrival, F.G. and her parents met with Tran, a sexual assault nurse examiner. Tran explained that her role was to provide medical care and to conduct a forensic examination, and explained the procedures involved in performing the examination. Both F.G. and her parents then consented to the examination. It can be reasonably inferred that F.G., who was 16 years old at the time, understood she was receiving medical treatment, which was going to include a physical examination, and that the information she provided was necessary to aid in her diagnosis and treatment. See *State v. Vaught*, 268 Neb. 316, 682 N.W.2d 284 (2004) (the appropriate state of mind of the declarant may be reasonably inferred from the surrounding circumstances).

Further, F.G.'s statements to Tran were pertinent to medical diagnosis or treatment. As noted by the court in *State v. Vigil*, 283 Neb. 129, 140-41, 810 N.W.2d 687, 697-98:

> A sexual assault victim may have injuries or may have contracted a sexually transmitted disease even though the victim feels no pain and bears no external signs of injury.
>
> Moreover, there were concerns about [the victim's] psychological health. Details of the abuse are relevant to psychological implications regardless of whether any physical injury occurred. . . . [E]valuation of the need for psychological treatment is a fundamental component of sexual assault cases and, thus, a component of medical diagnosis and treatment in such cases. Where an individual is alleged to be the victim of sexual assault, statements reasonably pertinent to medical diagnosis and treatment of both physical and psychological trauma are admissible under rule 803(3).

Tran testified it is important to receive an accurate account of the assault for purposes of diagnosis and treatment, and that she relied on F.G.'s account of the assault in her treatment and diagnosis of F.G. Based on the circumstances of the assault as described by F.G., Tran administered preventative treatment to F.G. to guard against sexually transmitted diseases. In addition, she referred F.G. for mental health services based on her recent self-harming behavior.

We conclude that F.G.'s statements to Tran were made for the purpose of medical diagnosis and treatment and thus, fell within the medical exception of the hearsay rule. Accordingly, the trial court did not err in allowing Tran to testify about F.G.'s statements regarding the assault. Summmage's assignment of error is without merit.

*Excessive Sentence.*

Finally, Summage assigns that the sentence imposed by the trial court was excessive. Summage was convicted of first degree sexual assault, a Class II felony. See Neb. Rev. Stat. § 28-319(2) (Reissue 2008). Sentencing guidelines for a Class II felony provide for a maximum

of 50 years' imprisonment and a minimum of one year imprisonment. Neb. Rev. Stat. § 28-105 (Cum. Supp. 2014). The trial court's sentence of 25 to 30 years' imprisonment is clearly within the statutory limits, which Summage does not contest. Therefore, we need only determine whether the trial court's sentence was an abuse of discretion. See *State v. Berney*, 288 Neb. 377, 847 N.W.2d 732 (2014) (an appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court).

When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the violence involved in the commission of the crime. *State v. Hunnel*, 290 Neb. 1039, 863 N.W.2d 442 (2015).

At the time of sentencing, Summage was 36 years old. He had an extensive criminal record, including adjudications as a juvenile and convictions for various offenses, such as burglary, theft by unlawful taking, third degree assault, assault and battery, false imprisonment (amended from first degree sexual assault), third degree assault, and conspiracy to distribute narcotics. Between the ages of 9 and 35, Summage had been cited and/or arrested 31 times for felony and misdemeanor offenses. The instant case is his seventh felony conviction. He has been jailed on 6 occasions and put in prison on 3 occasions. He has been put on probation 7 times; 3 times as a juvenile and 4 times as an adult. He was on federal supervised release when he was arrested and convicted for the current offense. In addition, several tests were conducted to determine the degree of risk that Summage presented to the community and the risk to recidivate. The test scores indicated he was highly likely to commit additional crimes. We conclude that the trial court did not abuse its discretion in sentencing Summage to 25 to 30 years' imprisonment.

CONCLUSION

We conclude that the evidence was sufficient to support Summage's conviction; that F.G.'s statements to Tran were made for the purpose of medical diagnosis and treatment and thus, fell within the medical exception of the hearsay rule; and that Summage's sentence is not excessive. Accordingly, Summage's conviction and sentence for first degree sexual assault is affirmed.

AFFIRMED.